OPINION OF THE COURT
John Manning Regan, J.
The plaintiff Rochester Gas and Electric Corporation (hereinafter R.G.&E.) has pleaded a cause of action in negligence against the City of Rochester. The complaint states that, on two occasions, March 19 and April 18,1979, city-owned water mains burst underneath Culver Road — a principál north-south route in the city, and a city street — causing damage to R.G.&E.’s electrical conduits, which were also buried underneath Culver Road near the water *421 mains. The complaint values the damages in the sum of $3,807.25.
The case is before the court on a trial de novo from a dismissal of the complaint by an arbitration panel.
The proof establishes that, in 1978, the plaintiff hired a utility contractor, Heuer Contractors, Inc., to lay its underground electrical conduits along Culver Road. Heuer excavated a ditch along Culver Road four feet wide and four and one-half feet deep from Canterbury Road to Park Avenue, both east-west streets, which intersect with Culver Road about one-quarter mile apart. So laid open, the ditch exposed the city’s water mains, at the deepest level; the telephone company’s transmission cables, at the middle level; and the plaintiff’s replaceable electrical conduits, at the highest level.
Heuer’s foreman testified that, during the 1978 construction, he noticed water seepage, in significant amounts, from three places along the exposed water main. Moreover, he reported these leaks to the plaintiff’s, R.G.&E.’s, supervising inspector, Mr. Dozier, at that time. In turn, the R.G.&E. supervisor reported the leaks to the city. Notwithstanding this knowledge about the leaks, the R.G.&E. thereafter directed Heuer to lay the electrical conduits and backfill the ditch. The new conduits’ installation was completed in the summer of 1978.
On March 19, 1979, R.G.&E. dispatched Mr. Dozier to the Culver Road area near Park Avenue. When he arrived, he found that the street had caved in and that water was gushing forth from the hole. Upon further examination, he saw that the R.G.&E. electrical conduits had been undermined and were broken. He summoned a city repair crew who fixed the water main leak first, and then his crew repaired the electric cable rupture second.
Following these events, Mr. Roy Murdock, an employee of the plaintiff, wrote a letter, on April 4, 1979, to the city water engineer telling him: “When the new road was excavated for the water main problem, it was evident that a much larger portion of the road * * * had been undermined * * * This erosion may well lead to cracked and uneven pavement in the near future.”
*422 As prophesied, the road collapsed again on April 18, 1979, and caused similar damage to the plaintiff’s conduits about 300 feet farther north on Culver Road from the site of the first episode.
A municipality must exercise reasonable care in the construction and maintenance of its water supply systems so as to avoid injury to abutting property owners and the public generally. (De Witt Props. v City of New York, 44 NY2d 417.) Water supply systems are not governmental functions, and when municipalities operate such systems, they are not privileged under the limited immunities from tort liability granted to them in the exercise of their police power. But, neither are they insurers of safety from damage and harm. To cast a municipality in tort liability for damages, it is necessary to prove negligence. (Foltis, Inc. v City of New York, 287 NY 108.)
Plaintiff’s trial testimony proved that the city had actual notice of water seepage in the Culver Road water mains in 1978. Moreover, city crews were seen repairing the Culver Road mains in February, 1979 within 750 feet of the main breaks in March and April, 1979. The main itself was installed in 1894, and was more than 85 years old at this time, and was in an obviously deteriorated condition.
While the plaintiff has proved actual notice to the city in respect to the risk of the March water main break, it has also established that it, too, had actual notice of the risks from water mains leakage. Its own contractor, in 1978, notified the plaintiff’s supervisor of this condition while the excavation was still open and before the plaintiff laid its cables. While knowledge of this dangerous condition does not necessarily establish assumption of the risks involved (see Porter v Avlis Constr. Co., 57 AD2d 222), the plaintiff here must be held to a standard of care consistent with its expertise as a public utility. The plaintiff lays underground cables frequently, and must know that underground water leaks can undermine the lateral and foundation support necessary for the preservation of its cables in a fixed and secure position. Despite such knowledge, it placed its conduits in the ground next to a leaking water main, and backfilled the ditch. This constitutes assump *423 tion of the risk as a matter of law. (Belotte & Nardone v Dunn Garden Apts., 14 AD2d 602.)
As to the first break, in March, both the defendant and the plaintiff were on actual notice of the risks from the leaking water mains. Notwithstanding the known risks, the plaintiff laid its cables. Notwithstanding the actual notice, the city took no action, made no inspection, and undertook no program of watchfulness or monitoring. The behavior of both parties constitutes negligence, and the negligence of both caused the damages. For, obviously, had the plaintiff heeded the warning of its own inspectors and contractors, it would not have laid the conduits. And, similarly, if the city had listened to the notices given, and inaugurated a repair and replacement program for its water mains, the breaks would not have happened.
The March 19 break in the main caused the road to cave in, and the plaintiff’s letter of April 4 advised the city of more extensive subterranean erosion than was visible from the surface. Yet the city took no action even after the March 19 incident until the rupture, on April 18, had caused additional damage to the plaintiff’s cables.
The city’s answer to the claim for damages as a result of the April 18 break is that the location of the main break in April was too distant from the March event, to consider the March break as notice of where the April break would occur. While distance is a factor in evaluating the scope of the notice, and while it is true the plaintiff’s letter did not pinpoint the spot of the April break, 300 feet (+ or -) is sufficiently close, as a matter of law, to hold the city on notice to the risk of collapse of Culver Road at the site of the April break. From the evidence before me, the conclusion is inescapable that if the city had responded to the March 19 cave in and the April 4 notices, and if the city had excavated, inspected and repaired the water main, the April break would not have occurred.
In regard to the April 18 break, therefore, the city’s conscious failure to perform its legal duties in respect to the maintenance and repair of its water systems, intervened between whatever risks the plaintiff had assumed, and the defendant had ignored, in 1978. For those risks *424 had already materialized into actual damage on March 19. After that March 19 event, the city’s duty was clear and unequivocal. It had to act promptly and efficiently. Yet it delayed for a month, and within that time plaintiff’s cables suffered further damage from the broken water main. As to this April 18 accident, the failure of the city to discharge its duty of maintenance was the sole proximate cause of the damages, and the knowledge and notices of 1978 had ceased to be a substantial factor. (Daas v Pearson, 66 Misc 2d 95; Restatement, Torts 2d, § 431.)
Accordingly, I find the plaintiff has proved the city wholly liable in respect to the second break.
Insofar as the first break of March 19 is concerned, it is pertinent to observe that since September 1, 1975, CPLR article 14-A has allowed recovery in an action in negligence despite the contributory negligence, or assumption of risk, of the injured plaintiff. Comparable to the action in contribution authorized under CPLR article 14, the provisions of CPLR 1411 actually allow a joint tort-feasor to sue a concurrently negligent party for self-inflicted injuries to his own person or property.
Prior to the enactment of these articles, statutory law permitted contribution among joint tort-feasors only where their concurrent acts of negligence had caused injury to the person or property of a third party, and then only after that third party had recovered a joint judgment against them. (Civ Prac Act, § 211-a; former CPLR 1401, as amd by L 1964, ch 388; 10 NY Jur, Contribution, § 18, p 482.)*
It is not enough, however, even with the liberalization of actions among tort-feasors concurrently negligent, to decide merely that both parties were negligent. It is also *425 necessary to decide in what proportions their negligence caused and contributed to the damages. (Sheehan v City of New York, 40 NY2d 496.)
In order to accomplish that apportionment, this court must focus on two principles of negligence law: (1) the degree of proximate cause attributable to each act of negligence that produced the harm, and (2) the scope and intensity of the legal duty on each individual tort-feasor.
Our Court of Appeals has recently concluded that a concurrent tort-feasor’s liability can still be apportioned, even though he owes no direct duty to the party injured. (See Garrett v Holiday Inns, 58 NY2d 253.) But the apportionment depends upon how much of “an independent obligation can be found on the part of a concurrent wrongdoer to prevent foreseeable harm”. (Garrett v Holiday Inns, supra, p 261.)
These variables — the quality of the breach of duty and the degree of proximate cause — are familiar cornerstones in the law of negligence. But familiarity with terminology is no guarantee of practical understanding. In the case at bar, as trier of fact, the court must adjudicate the measure of duty breached, and the quantum, in dollars, of proximate cause liability.
A plaintiff always has a greater duty of care towards his own property. That proposition seems elementary. Yet, R.G.&E. offers no excuse for putting its new conduits in an excavated ditch alongside a leaking water main. Moreover, its right to rely on the city’s duty to maintain and repair the water mains must be tempered with its knowledge and experience that municipalities notoriously procrastinate in the performance of their proprietary functions.
On the other hand, once it had installed the conduits underground, and had told the city of the attendant risk of damage from the leaks, there was precious little else for the plaintiff to do but wait. The city alone had the right (and the duty) to fix the mains. Therefore, as time passed, the R.G.&E.’s negligence diminished as a proximate cause, and the city’s neglect to act, in the face of a clear duty to act, increased as a proximate cause. For delay, as it continued, became harder and harder for the city to defend.
*426 Under all the circumstances of this case, I find the city liable to the extent of 40% of the damages for the March 19 cave in, and fully liable for all of the damages of the April 18, 1979 cave in, which is, to wit: the sum of $810.80 for the March 19 damage, and the sum of $1,780.28 for the April 18 damage. Interest on the total award shall run from April 20, 1979. (CPLR 5001, subd [c].)

 The beginning text of former CPLR 1401 reads:
“Where a money judgment has been recovered jointly against defendants in an action for a personal injury or for property damage, each defendant who has paid more than his pro rata share shall be entitled to contribution from the other defendants with respect to the excess paid over and above his pro rata share; provided, however, that no defendant shall be compelled to pay to any other such defendant an amount greater than his own pro rata share of the entire judgment.”
This statute, without doubt, created an arithmetical division of aliquot shares among joint tort-feasor defendants, without regard to apportionment in accordance with causal responsibility. The courts did not receive it favorably, and eventually interpreted it contrary to its expressed provisions (see, e.g., McCabe v Century Theatres, 25 AD2d 154), a decision which directed equitable apportionment based on theories of causation.